IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES MULLENIX AND, | § | |
| DEVICKA MULLENIX | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Cause No. |
| vs. | § | |
| | § | |
| ABBVIE INC., AND | § | |
| ABBOTT LABORATORIES, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs, James Mullenix and Devicka Mullenix ("Plaintiffs"), residing in Tuscaloosa, Alabama, by and through his undersigned counsel, hereby sues Defendants AbbVie Inc. and Abbott Laboratories, Inc. ("Defendants") and alleges as follows:

## INTRODUCTION

1.     This case involves the prescription drug AndroGel, which is manufactured, sold, distributed and promoted by Defendants as a testosterone replacement therapy.

2.     Defendants misrepresented that AndroGel is a safe and effective treatment for hypogonadism or "low testosterone," when in fact the drug causes serious medical problems, including life threatening cardiac events, strokes, and thrombolytic events.

3.     AndroGel causes the hematocrit level to increase, thereby thickening the blood. This effect, if not monitored and controlled properly, can lead to life threatening cardiac events, strokes and thrombolytic events.

1

4. Defendants failed to adequately warn physicians about the risks associated with AndroGel and the monitoring required to ensure the safety of patients using AndroGel.

5. Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for AndroGel. Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low T."

6. As a result, diagnoses of Low T have increased exponentially. This has directly related to AndroGel's sales increasing to over $1.37 billion per year.

7. However, consumers of AndroGel were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thrombolytic events.

**PARTIES**

8. Plaintiffs are natural persons and citizens of the State of Alabama.

9. Defendant AbbVie Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064.

10. Defendant Abbot Laboratories, Inc. is a corporation organized and existing under the laws of the state of Illinois and maintains its principal place of business at 100 Abbot Park Road, Abbott Park, Illinois 60064.

11. By way of background, Unimed Pharmaceuticals Inc. originally developed AndroGel and sought FDA approval in 1999. Before the drug was approved by the FDA in 2000, Solvay Pharmaceuticals Inc. acquired Unimed Pharmaceuticals, Inc. and subsequently brought AndroGel to market. In 2010, Defendant Abbott Laboratories, Inc. acquired Solvay's

pharmaceutical division, which included AndroGel. Then, in 2013, Abbott created AbbVie, a company composed of Abbott's former proprietary pharmaceutical business, which included AndroGel.

12.    At all times herein mentioned, Defendants, in interstate commerce and in this judicial district, advertised, promoted, supplied, and sold to distributors and retailers for resale to physicians, hospitals, medical practitioners, and the general public a certain pharmaceutical product, AndroGel.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants and because the amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost, and because, among other reasons, Defendants have significant contacts with this district by virtue of doing business within this judicial district.

14.    Venue is proper within this district pursuant to 28 U.S.C. § 1391 because Defendants reside in this district and because a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## GENERAL ALLEGATIONS

15.    This action is for damages brought on behalf of Plaintiff who was prescribed and supplied with, received and who has taken and applied the prescription drug AndroGel, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants. This action seeks, among other relief, general and special damages and equitable

3

relief in order to enable Plaintiff to treat and monitor the dangerous, severe and life-threatening side effects caused by this drug.

16.    Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff's injuries and damages.

17.    At all times herein mentioned, the Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drug AndroGel for the use and application by Plaintiff.

18.    At all times herein mentioned, Defendants were authorized to do business within the state of residence of Plaintiffs and in the state of Illinois.

19.    At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff herein.

20.    Plaintiffs file this lawsuit within the applicable limitations period of first suspecting that said drugs caused the appreciable harm sustained by Plaintiff. Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful case of Plaintiff's injuries at an earlier time because the injuries were caused without perceptible trauma or harm, and when Plaintiff's injuries were discovered their cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations

period prior to the filing of this action. Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public and to the medical profession that the drug AndroGel is safe and free from serious side effects, and Defendants have fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

## OVERVIEW

21.     Hypogonadism is a specific condition of the sex glands, which in men may involve the diminished production or nonproduction of testosterone.

22.     In 1999, when Unimed Pharmaceuticals Inc., one of the Defendants' predecessor companies, asked for FDA approval of AndroGel, it asserted that hypogonadism was estimated to affect approximately "one million American men."

23.     In 2000, when the FDA approved AndroGel, the company announced that the market was "four to five million American men." By 2003, the number increased to "up to 20 million men." However, a study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

24.     Defendants coordinated a massive advertising campaign designed to convince men that they suffered from low testosterone. Defendants orchestrated a national disease awareness media blitz that purported to educate male consumers about the signs of low testosterone. The marketing campaign consisted of television advertisements, promotional literature placed in

healthcare providers' offices and distributed to potential AndroGel users, and online media including the unbranded website "IsItLowT.com." The website asserts that millions of otherwise healthy men experience low testosterone and encourages male visitors to "Take the 'Is it Low T' Quiz." The "Is it Low T" quiz asks men if they have experienced potential signs of low testosterone, including "Have you experienced a recent deterioration in your ability to play sports?," "Are you falling asleep after dinner?," "Are you sad and/or grumpy?," and "Do you have a lack of energy?"

25.    Dr. John Morley, director of endocrinology and geriatrics at the St. Louis University School of Medicine, developed this quiz at the behest of Dutch pharmaceutical company Organon BioSciences, in exchange for a $40,000 grant to his university. The pharmaceutical company instructed Dr. Morley, "Don't make it too long and make it somewhat sexy." Dr. Morley drafted the questionnaire in 20 minutes in the bathroom, scribbling the questions on toilet paper and giving them to his secretary the next day to type up. Dr. Morley admits that he has "no trouble calling it a crappy questionnaire" and that it is "not ideal." This is the "Low T Quiz" used on the "IsItLowT" website. Natasha Singer, *Selling That New-Man Feeling* (Nov. 23, 2013), N.Y. TIMES.

26.    The television advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

27.     Since the FDA approved AndroGel, Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

28.     While running its disease awareness campaign, Defendants promote their product AndroGel as an easy to use topical testosterone replacement therapy. Defendants contrast their product's at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

29.     Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease. Although prescription testosterone replacement therapy had been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

30.     What consumers received, however, were not safe drugs, but a product which causes life-threatening problems, including strokes and heart attacks.

31.     Defendants successfully created a robust and previously nonexistent market for their drug. Defendant Abbott Laboratories spent $80 million promoting AndroGel in 2012. The company also spent millions on its unbranded marketing including commercials and its websites, www.IsItLowT.com and www.DriveForFive.com, sites which recommend that men have regular checkups with their physicians and five regular tests done: including cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone.

32.     Defendants' advertising paid off in a return of $1.4 billion in sales during the past year, making AndroGel the biggest selling androgen drug in the United States.  Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion

by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?*, May 10, 2012, Bloomberg Businessweek, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

33. In early 2013, Medical Marketing & Media named two AbbVie executives as "the all-star large pharma marketing team of the year" for promotions of AndroGel and unbranded efforts to advance low T. *See* Singer, *Selling That New-Man Feeling, supra*; See *also*, Larry Dobrow, *All-star large pharma marketing team of the year: Androgel.* Jan. 2, 2013, Medical Marketing & Media, *available at:* http://www.mmm-online.com/all-star-large-pharma-marketing-team-of-the-year-androgel/article/273242/.

34. The marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and that the use of AndroGel is safe for human use, even though Defendants knew these to be false, and even though Defendants had no reasonable grounds to believe them to be true.

35. There have been a number of studies suggesting that testosterone in men increases the risk of heart attacks and strokes.

36. In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group were suffered adverse events.

37. In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels" which indicated that testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

38. On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a previous diagnosis of heart disease.

39. Two days later, on January 31, 2014, the FDA issued a Drug Safety Communication to physicians advising that the FDA was investigating the risk of stroke, heart attack and death in men using testosterone products based on the recent studies suggesting an increased risk of cardiovascular events among men using these products.

40. And on April 11, 2014, the European Medicines Agency announced that in light of the recent studies regarding the increased risk of cardiovascular events in patients using testosterone products, its Pharmacovigilance Risk Assessment Committee would be reviewing all data on the benefit-risk balance of testosterone-containing medicines to determine whether the marketing authorizations for these products should be maintained, varied, suspended or withdrawn across the European Union.

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

41. The Food and Drug Administration approved AndroGel 1% on February 28, 2000 for the treatment of adult males who have low or no testosterone (AndroGel 1.62% was approved in April, 2011). After FDA approval, AndroGel was widely advertised and marketed by Defendant as a safe and effective testosterone replacement therapy.

42. AndroGel, is a hydroalcoholic gel containing testosterone in either 1% or 1.62%, applied to the chest, arms or stomach and enters the body through transdermal absorption. The AndroGel 1.62% product also contains isopropyl myristate as an ointment and ethanol for absorption enhancement.

43.    Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

44.    The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

45.    In men, testosterone levels normally begin a gradual decline after the age of thirty.

46.    The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood.  However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication.  Resultantly, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

47.    AndroGel may produce undesirable side effects to patients who use the drug, including but not limited to, myocardial infarction, stroke, and death.

48.    In some patient populations, AndroGel use may increase the incidence of myocardial infarctions and death by over 500%.

49.    In addition to the above, AndroGel has been linked to several severe and life changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied AndroGel. Patients taking AndroGel may experience enlarged prostates and increased serum prostate-specific antigen levels.

50.    Secondary exposure to AndroGel can cause side effects in others. In 2009 the FDA issued a black box warning for AndroGel prescriptions, advising patients of reported virilization in children who were secondarily exposed to the gel. Testosterone may also cause physical changes in women exposed to the drug and cause fetal damage with pregnant women who come into secondary contact with AndroGel.

51.     Defendants' marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

52.     Defendants successfully marketed AndroGel by undertaking a "disease awareness" marketing campaign. This campaign sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

53.     AbbVie's advertising program, sought to create the image and belief by consumers and their physicians that the use of AndroGel was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew or should have known these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

54.     Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using AndroGel. Defendants deceived potential AndroGel users by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

55.     Defendants concealed material relevant information from potential AndroGel users and minimized user and prescriber concern regarding the safety of AndroGel.

56.     In particular, in the warnings Defendants give in their commercials, online and print advertisements, Defendants fail to mention any potential cardiac or stroke side effects and falsely

represents that AbbVie adequately tested AndroGel for all likely side effects. Defendants also fail to warn and instruct regarding the importance of adequate monitoring of hematocrit levels.

57.     As a result of Defendants' advertising and marketing, and representations about its product, men in the United States pervasively seek out prescriptions for AndroGel. If Plaintiff in this action had known the risks and dangers associated with AndroGel, Plaintiff would not have taken AndroGel and consequently would not have been subject to its serious side effects.

## SPECIFIC FACTUAL ALLEGATIONS

58.     Plaintiff was prescribed AndroGel 1.0% and used it as directed from approximately June 2006 to January 2007.

59.     Plaintiff was 56 years of age when he was prescribed and used testosterone for symptoms he attributed to low testosterone after viewing Defendants' advertisements.

60.     Plaintiff was very healthy and had no history of heart disease or strokes prior to taking testosterone. In keeping with his healthy and proactive lifestyle, Plaintiff agreed to initiate testosterone treatment. He relied on claims made by Defendants that testosterone had been clinically shown to safely and effectively raise testosterone levels.

61.     Plaintiff was diagnosed with an acute stroke on or about December 12, 2006. He necessitated a 7-day hospitalization and months of rehabilitation. As a result, for the rest of his life he must undergo regular testing, adhere to a restrictive diet, and take medication. Due to his stroke he is now at markedly increased risk of additional cardiovascular disease, cerebrovascular accidents, and death.

62.     Had Defendants properly disclosed the risks associated with testosterone, Plaintiff would have avoided the risk of myocardial infarction by either not using testosterone at all,

severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drugs were adversely affecting his health.

63.     As alleged herein, as a direct, proximate, and legal result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiff suffered severe and permanent physical and emotional injuries, including, but not limited to myocardial infarction. Plaintiff has endured pain and suffering, has suffered economic loss, including incurring significant expenses for medical care and treatment and will continue to incur such expenses in the future. Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN

64.     Plaintiffs incorporate by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

65.     The AndroGel manufactured and/or supplied by Defendants was defective due to inadequate warnings or instructions because Defendants knew or should have known that the product created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks. The AndroGel manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of AndroGel, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

66.     As a direct and proximate result of Plaintiff's reasonably anticipated use of AndroGel as manufactured, designed, sold, supplied, marketed and/or introduced into the stream

of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## SECOND CAUSE OF ACTION
## NEGLIGENCE

67.     Plaintiffs incorporate by reference herein each of the allegations set forth in this Complaint as though set forth herein.

68.     At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of AndroGel.

69.     At all times herein mentioned, Defendants negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold AndroGel and failed to adequately test and warn of the risks and dangers of AndroGel.

70.     Despite the fact that Defendants knew or should have known that AndroGel caused unreasonable, dangerous side effects, Defendants continued to market AndroGel to consumers including Plaintiff, when there were safer alternative methods of treating loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions AndroGel's advertising claims are caused by low testosterone.

71.     Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

72.    Defendants' negligence was a proximate cause of Plaintiff's injuries, harm and economic loss which Plaintiff suffered, and will continue to suffer, as described and prayed for herein.

## THIRD CAUSE OF ACTION
## FOR BREACH OF IMPLIED WARRANTY

73.    Plaintiffs incorporate by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

74.    Prior to the time that the aforementioned products were used by Plaintiff, Defendants impliedly warranted to Plaintiff and Plaintiff's agents and physicians that AndroGel was of merchantable quality and safe and fit for the use for which it was intended.

75.    Plaintiff was and is unskilled in the research, design and manufacture of the products and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using AndroGel.

76.    AndroGel was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that AndroGel has dangerous propensities when used as intended and will cause severe injuries to users.

77.    As a result of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## FOURTH CAUSE OF ACTION
## FOR BREACH OF EXPRESS WARRANTY

78.    Plaintiffs incorporate by reference here each of the allegations set forth in this Complaint as though fully set forth here.

79.    At all times mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants or their

authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that AndroGel is safe, effective, fit and proper for its intended use. Plaintiff purchased AndroGel relying upon these warranties.

80.     In utilizing AndroGel, Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that AndroGel is unsafe and unfit for its intended uses.

81.     As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

### FIFTH CAUSE OF ACTION
### FRAUD

82.     Plaintiffs incorporate by reference here each of the allegations set forth in this Complaint as though set forth fully herein.

83.     Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed AndroGel, and up to the present, willfully deceived Plaintiff by concealing from them, Plaintiff's physicians and the general public, the true facts concerning AndroGel, which the Defendants had a duty to disclose.

84.     At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of AndroGel and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using AndroGel. Defendants knew of the foregoing, that AndroGel is not safe, fit and effective for human consumption, that using AndroGel is hazardous to health, and that AndroGel has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiff suffered.

85.   Defendants concealed and suppressed the true facts concerning AndroGel with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff physicians would not prescribe AndroGel, and Plaintiff would not have used AndroGel, if they were aware of the true facts concerning its dangers.

86.   As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

**SIXTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

87.   Plaintiffs incorporate by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

88.   From the time AndroGel was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but not limited to the misrepresentation that AndroGel was safe, fit and effective for human consumption. At all times mentioned, Defendants conducted a sales and marketing campaign to promote the sale of AndroGel and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the health risks and consequences of the use of the abovementioned product.

89.   The Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

90.   The representations by the Defendants were in fact false, in that AndroGel is not safe, fit and effective for human consumption, using AndroGel is hazardous to health, and

17

AndroGel has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

91.     The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of AndroGel.

92.     In reliance of the misrepresentations by the Defendants, and each of them, Plaintiff was induced to purchase and use AndroGel. If Plaintiff had known of the true facts and the facts concealed by the Defendants, Plaintiff would not have used AndroGel. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

93.     As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

**SEVENTH CAUSE OF ACTION**
**ON BEHALF OF DEVICKA MULLENIX**
**LOSS OF CONSORTIUM**

94.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

95.     At all times hereinmentioned, Plaintiff Devicka Mullenix was the lawful spouse of Plaintiff James Mullenix.

96.     As a direct and proximate result of the above-described conduct by Defendants and the injuries sustained by Plaintiff James Mullenix, Plaintiff Devicka Mullenix has suffered a loss of spousal consortium, companionship, society, affection, services and support.

**PUNITIVE DAMAGES ALLEGATIONS**

97.     Plaintiffs incorporate by reference here each of the allegations set forth in this Complaint as though fully set forth herein.

18

98.     The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights of Plaintiff and other AndroGel users and for the primary purpose of increasing Defendants' profits from the sale and distribution of AndroGel. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

99.     Prior to the manufacturing, sale, and distribution of AndroGel, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using AndroGel.

100.    Despite its knowledge, Defendants, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in AndroGel and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in AndroGel. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of AndroGel knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

101.    Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants as follows:

(a)     For general damages in a sum in excess of the jurisdictional minimum of this Court;

(b)     For medical, incidental, and hospital expenses according to proof;

(c)     For pre-judgment and post-judgment interest as provided by law;

(d)     For full refund of all purchase costs Plaintiff paid for testosterone;

(e)     For compensatory damages in excess of the jurisdictional minimum of this Court;

(f)     For consequential damages in excess of the jurisdictional minimum of this Court;

(g)     For punitive damages in an amount in excess of any jurisdictional minimum of this Court and in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(h)     For attorneys' fees, expenses, and costs of this action; and

(i)     For such further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts and as to all issues.

Dated: April 23, 2014          Respectfully submitted,

*/s/ Brian J. Perkins*
Brian J. Perkins (IL #6283734)
MEYERS & FLOWERS, LLC
225 West Wacker Drive, Suite 1515
Chicago, IL 60606
Telephone: (630) 232-6333
Facsimile: (630) 845-8982
Email: bjp@meyers-flowers.com

_/s/ Rachel Abrams_
Rachel Abrams (CA #209316)
**LEVIN SIMES LLP**
353 Sacramento Street, 20th Floor
San Francisco, CA 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001
Email: rabrams@levinsimes.com
(pro hac vice application to be filed)

**Attorneys for Plaintiffs**